# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-599


**MARVIS MELVIN**

**VERSUS**

**KIMBERLY MILLER**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2010-1150
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


## JIMMIE C. PETERS
## JUDGE


**\*\*\*\*\*\*\*\*\*\***


Court composed of Sylvia R. Cooks, John D. Saunders, Jimmie C. Peters, Marc T. Amy and Billy H. Ezell, Judges.


**REVERSED, RENDERED, AND REMANDED.**


**AMY, J., dissents and assigns written reasons.**


**Elvin C. Fontenot, Jr.**
**110 East Texas Street**
**Leesville, LA 71446**
**(337) 239-2684**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kimberly Miller**


**Marvis Melvin**
**611 California Street**
**DeRidder, LA 70634**
**IN PROPER PERSON**

**PETERS, J.**

Kimberly Miller appeals a trial court judgment on rule addressing her attempt to relocate herself and her child, Marvis Melvin, Jr., from DeRidder, Louisiana, in Beauregard Parish, to Hammond, Louisiana, in Tangipahoa Parish, and setting the parameters of custody and visitation depending on Ms. Miller's response to the particulars of the judgment. For the foregoing reasons, we reverse the trial court's judgment; render judgment rejecting the request of Marvis Melvin[1] to be named temporary custodial parent, pending a trial on the merits of his petition; render judgment reinstating the custodial terms of the June 18, 2012 consent judgment; and remand this matter to the trial court for further proceedings.

## DISCUSSION OF THE RECORD

Kimberly Miller and Marvis Melvin were formerly husband and wife, and while both had children of previous marriages, only one child was born of their marriage, Marvis Melvin, Jr. (hereinafter referred to as "Marvis Jr."), born on June 20, 2005.[2] After their marriage dissolved, the litigants entered into a consent custody and child support decree on June 18, 2012, wherein both parents were granted joint custody, with Ms. Miller being named as domiciliary parent. The terms of this judgment concerning custody and support were apparently carried through in the January 7, 2013 divorce decree, although neither the consent decree nor the divorce decree are in the record before us. According to Mr. Melvin's

---

[1] The caption on the trial court record lists Mr. Melvin's first name as "Marvin." However, the rest of the record and all briefs submitted to this court list his first name as "Marvis." Given that consistency and the fact that the child at issue is "Marvis Jr." we conclude the caption is incorrect and we will refer to him as Marvis.

[2] The record before us does not contain any pleadings prior to the August 6, 2014 pleading which is the basis of this appeal. Some of the factual background, including the suggestion that Ms. Miller and Mr. Melvin each had a daughter by previous marriages or relationships and Marvis Jr.'s birth date, is derived from either Mr. Melvin's pleading or testimony found in the transcript of the rule to show cause hearing now before us.

August 6, 2014 petition, which is the pleading giving rise to the current phase of this litigation, the consent decree provided that:

> Kimberly Miller and Marvis Melvin were awarded joint custody of Marvis Melvin, Jr., with Kimberly Miller being designated primary domiciliary parent. Furthermore, Marvis Melvin was allowed custody of Marvis Melvin, Jr. on alternating weekends, alternating holidays, and other times during the summer as agreed to by the parties.

The custody arrangement apparently functioned without significant problems until after Ms. Miller's remarriage on May 5, 2014. Ms. Miller's new husband, Greg Brumfield, Sr., previously resided in Beauregard Parish, but by the time of the marriage, had moved into an apartment in Baton Rouge, Louisiana in East Baton Rouge Parish.[3] In early June of 2014, Ms. Miller and her children, including Marvis Jr., moved into her new husband's apartment in Baton Rouge. Ms. Miller did not provide Mr. Melvin with written notice of her intent to relocate to Baton Rouge before making the move. By late summer, the newly-married couple had decided to seek a family home in Hammond, Louisiana. That move ultimately occurred, and Marvis Jr. enrolled in a Hammond school on August 11, 2014. The family completed the move to Hammond on September 29, 2014. Thus, at the time of the hearing in this matter, Marvis Jr. was attending school in Hammond.

Mr. Melvin exercised custodial visitation rights to Marvis Jr. during the entire summer of 2014, and days after he returned the child to his mother in early August, Mr. Melvin instituted the suit now before us. The initial filing occurred on August 6, 2014, when Mr. Melvin, in proper person, filed a petition in Beauregard Parish seeking to be named Marvis Jr.'s domiciliary custodian. He asserted that his former wife's move to Baton Rouge constituted a change of circumstances

---

[3] Ms. Miller testified that her current husband moved from DeRidder in August or September of 2013.

affecting Marvis Jr.'s welfare and that it was in the child's best interest to name him as domiciliary custodian. However, he did not raise as an issue Ms. Miller's failure to notify him of the move to Baton Rouge or to Hammond. In his petition, Mr. Melvin also requested that Ms. Miller be ordered to show cause why "an interim custody judgment should not be rendered pending a trial in this matter." However, he did not file a rule pursuant to La.Code Civ.P. art. 2592(8) which would have allowed him to proceed and quickly address the merits of his claims. Instead, Mr. Melvin filed a petition which requires a response from the opposing counsel or the entering of a preliminary default to move the principal issue forward.

The trial court initially set Mr. Melvin's rule for interim relief on September 15, 2014, or slightly over a month after the petition filing date. The trial court minutes of September 15, 2014, reflect that both Mr. Melvin and Ms. Miller appeared in court without counsel and stated to the trial court that "they are unable to reach an agreement and would like to have the matter set for trial." The trial court "refixe[d] the matter for November 5, 2014[;]" ordered that the litigants submit to counseling with a mediator; and "encourage[d] the parties to seek legal counsel." Given the fact that the September 15, 2014 setting was on Mr. Melvin's rule for interim custody, and the fact that Ms. Miller had yet to join issue with Mr. Melvin's petition by filing an answer, the action by the trial court can only be interpreted as a rescheduling of the rule for interim custody and not a setting of the trial on the merits.

Less than a month later, on October 8, 2014, the trial court executed an ex parte order moving the hearing up two days, to November 3, 2014. However, the hearing on the rule did not take place on November 3, 2014. The trial court minutes of that day reflect that Ms. Miller appeared with counsel and Mr. Melvin appeared again without counsel. The parties informed the court that they still had

3

not reached an agreement, and the trial court minutes reflect that the trial court responded by stating that it "would like to consider the position and the desires of the child[.]" The trial court then rescheduled the hearing for November 12, 2014, and ordered that Marvis Jr. be present on that day. The trial court also ordered that Marvis Jr. undergo counseling before the hearing.

The rule on interim custody finally went to trial on November 12, 2014, with Ms. Miller being represented by counsel and Mr. Melvin still representing himself. Although at first glance, one might interpret the proceeding as a trial on the merits, at the time of the hearing on the rule Ms. Miller had yet to answer the original petition orally or in writing and, therefore, the matter could not be heard as a trial on the merits. *See* La.Code Civ.P. art. 1571(A)(2). Additionally, no preliminary default had been entered against Ms. Miller and Mr. Melvin had not amended his original petition to assert any additional basis for relief.

Despite the complete absence in Mr. Melvin's pleadings of any reference to Ms. Miller's failure to comply with any written notice requirements when she moved to Baton Rouge or Hammond, the trial court began the trial on the rule by stating: "This was styled as a petition to modify custody; but in reality, the first issue is the objection to the relocation, which Ms. Miller has actually moved without permission of the court; and, so, the burden is on her to establish that the relocation should be granted." Thus, acting without any request from Mr. Melvin to do so, the trial court converted the rule for interim custody to one addressing Ms. Miller's failure to notify Mr. Melvin of her proposed relocation.

Upon the completion of the evidentiary phase of the trial on the rule, the trial court ruled against Ms. Miller, but not by awarding Mr. Melvin interim custody pending a trial on the merits, as he had requested in his petition. Instead, the trial court concluded that Ms. Miller had not carried her burden of proof by establishing

4

that her move from Beauregard Parish was in good faith and in Marvis Jr.'s best interest. It then entered an interim judgment allowing Marvis Jr. to remain enrolled in the Hammond school he was then attending until the beginning of the 2014 Christmas holidays; ordering that Marvis Jr. become enrolled in a Beauregard Parish school in January of 2015 at the end of the holiday period; and ordering that Ms. Miller remain the domiciliary custodian unless she chose not to accompany Marvis Jr. back to Beauregard Parish in January of 2015. If she chose to remain in Hammond, the judgment provided that Marvis Jr.'s custody would then automatically transfer to Mr. Melvin.[4] The trial court did not execute a written judgment to this effect until March 13, 2015, or two months past the deadline for transferring Marvis Jr. to a Beauregard Parish school.[5]

Ms. Miller timely perfected the appeal now before this court, and in her appeal, she asserts as her only assignment of error that the trial court erred in not permitting her to relocate with her minor child.

## OPINION

As previously stated, Mr. Melvin began this phase of the litigation by petition with a request for hearing on a rule to show cause for temporary custody pending a trial on the merits of his petition. That being the case, we must treat the judgment at issue as an interim decree pending trial on the merits.

In his petition, Mr. Melvin asserted that Ms. Miller had relocated to a new environment different from that which Marvis Jr. had grown accustomed to during his nine years of life. His petition further asserts that the move would make it "more difficult for him to remain a prominent figure" in his son's life; and that his

---

[4] The remainder of the judgment issued by the trial court at this time related to the custodial visitation rights of Mr. Melvin during the Thanksgiving and Christmas holidays in 2014.

[5] There is nothing in the record to reflect what decision Ms. Miller made with regard to staying in Hammond or moving back to Beauregard Parish.

son "has expressed feelings of wanting to remain in DeRidder with his father, so he may be able to finish school with his friends." Mr. Melvin suggested that his son "is afraid of moving, and thus, has suffered from many anxiety attacks; begging his father . . . to stop the process which will cause him to relocate." These pleadings establish that Mr. Melvin complains only of the effect of the relocation itself and not of Ms. Miller's failure to provide him with notice of relocation.

Because the trial court treated the hearing on the rule as a relocation-notice issue and not a custody issue, it placed the burden of proof on Ms. Miller to establish that her move to Hammond was in good faith and in Marvis Jr.'s best interest. *See* La.R.S. 9:355.10. To that end, Ms. Miller testified that after the January 7, 2013 divorce, she and Marvis Jr. remained in the family home until it was sold in February of 2014. At that time, she and Marvis Jr. moved into her mother's home in Leesville, Vernon Parish, Louisiana, and remained there until the move to Baton Rouge. At the time she moved into her mother's home, Ms. Miller was employed by the Social Security Administration (SSA) at an annual salary of approximately $65,000.00. However, her employment relationship with the SSA was terminated on March 27, 2014,[6] and despite her best efforts to find other employment between March 27, 2014, and her June 2014 move to Baton Rouge, she could only find part-time employment at the Coushatta Resort and Casino in Kinder, Louisiana. Even then, she only worked on the weekends that Mr. Melvin had custody of Marvis Jr.

Ms. Miller testified that before she moved to Baton Rouge, she found employment with Hertz Rentals. However, this new position paid only $42,000.00

---

[6] The termination was involuntary on her part, and at the trial on the rule, her employment relationship with SSA was on appeal.

6

to $45,000.00 per year. When she moved to Hammond, she continued to work with Hertz Rentals and commuted daily.

According to Ms. Miller, after the divorce and before her move to Baton Rouge, she took care of all of Marvis Jr.'s needs, including registering him for school, attending parent-teacher conferences, taking him to the doctor, and enrolling him in a basketball league. While she testified that Mr. Melvin attended a few of the basketball games, she also suggested that he showed little or no interest in Marvis Jr.'s health or education.

After the move to Baton Rouge, Ms. Miller had Marvis Jr. tested by Sylvan Learning Center (Sylvan) in Hammond and discovered that despite the fact that he was soon to start the fourth grade, he was performing at a 2.6 grade level. She testified that in his first six weeks of school in Hammond, his grades were in the C and D range, with one A. However, at the time of the trial of the rule, and with the assistance of Sylvan, Marvis Jr. had increased his ability to the 3.3 level and was making A's and B's—the same grades he had been making in Beauregard Parish schools before the move.[7]

Ms. Miller testified that she believes the relocation is in Marvis Jr.'s best interest, while at the same time, she recognized that Mr. Melvin should continue to play a part in the boy's life. She acknowledged that Mr. Melvin is not a "bad dad[,]" but complains that far too much of the time when he had custodial visitation privileges, he delegated custodial responsibility to his teenage daughter who lived with her mother, Mr. Melvin's first wife.

Ms. Miller also acknowledged that Marvis Jr. had expressed to her a desire to stay with his father and grandmother, but that he never expressed any special desire to attend school in DeRidder. Instead, his sole reason for wanting to stay

---

[7] Ms. Miller introduced Sylvan documents to support her testimony.

was to play sports. She testified that she explained to her son that his desire to play sports was not a sufficient reason for cancelling their planned move. Ms. Miller also testified that as one might expect of a typical nine-year-old child, Marvis Jr. had expressed at other times a desire to remain in Hammond. While he was not playing football at the time of the trial on the rule, she had already made arrangements for him to play basketball and baseball in the immediate future.

When Mr. Melvin asked Ms. Miller if Marvis Jr. was happier in DeRidder, she responded, "Honestly, it's both. He plays both sides." When Mr. Melvin followed-up with the question of whether she thought Marvis Jr. would be better served in DeRidder, she said, "No[,]" and explained as follows:

> Basically, it's the difference within the household. Totally different. In your household and during the experience, you never focus on the education as well as church, anything like that. You keep saying friends. Marvis never had friends to come over, so the friends that he would see would only be his classmates at school, which is the same thing that's occurring in D. C. Reeves that he's at now. You work shift work, so he would have to allow his 15-year-old sister to take care of him. No, I don't think that's the best thing for Marvis.

Concerning her personal connection to the various communities at issue in this litigation, Ms. Miller testified that she has no family in Hammond or DeRidder and that her close family members reside in Leesville. Her current husband is retired from the military, and is originally from Hammond.

Mr. Melvin testified that he had resided for thirty-five of his fifty-two years in Beauregard Parish,[8] and has resided with his eighty-eight-year-old mother since his divorce from Ms. Miller. In his job of thirty years, he works shift work five days per week.[9] One shift is from seven in the morning until three in the afternoon; another from three in the afternoon to eleven at night; and the third from eleven at

---

[8] He suggested that the seventeen years he had lived elsewhere was during one of his marriages, and we assume it was his first marriage.

[9] He did not identify with whom he works or the type of work he performs.

night to seven in the morning. He works Monday through Friday on the first and second shifts, and Sunday through Friday on the third shift. His income from this work is approximately $65,000.00 per year. In the past, when Marvis Jr. was with him and the child's presence conflicted with his work schedule, Mr. Melvin would cause Marvis Jr. to stay with his (Mr. Melvin's) mother, or sometimes with Mr. Melvin's teenage daughter by his first marriage. He acknowledged that his mother is in frail health and has recently been in and out of the hospital. While acknowledging that his first wife has custody of his fifteen-year-old daughter born of that marriage, Mr. Melvin testified that if he were to obtain custody of Marvis Jr. he would use his daughter to help supervise the child, especially when he worked the graveyard shift.

With regard to Marvis Jr.'s educational needs, Mr. Melvin acknowledged that Ms. Miller had notified him concerning some of the parent-teacher conferences in the past, but that he did not attend any. In the future, should he obtain custody, he planned to use his first wife, whom he testified is an assistant principal in the Beauregard Parish school system, to assist the boy with homework. Mr. Melvin also testified that someone whom he identified as Ms. Sowells could help with math homework. Neither of these individuals testified at the hearing on the rule.

Mr. Melvin testified that when Marvis Jr. lived in Beauregard Parish, he rode the school bus every afternoon to Mr. Melvin's mother's house where Ms. Miller would later pick him up. However, he acknowledged that during at least two-thirds of the time he was not there to care for the boy. He also acknowledged that his only reason for seeking a change in the custodial situation was that he just "want[s] Marvis to be happy[,]" and that he wanted to create an environment to keep his child out of jail. Based on a conversation with a friend in Baton Rouge,

9

and without presenting any evidence to support his assertion, Mr. Melvin testified that he knew that "Hammond ain't the best area in the world[,]" but "DeRidder is." According to Mr. Melvin, Marvis Jr. cried when he returned to Hammond after the summer of 2014, and based on that incident he made a promise to do everything he could do to bring the boy back to DeRidder.

Mr. Melvin testified that during the summer of 2014, Marvis Jr. spent all but one week in DeRidder and stayed most of the time at his paternal grandmother's home while Mr. Melvin worked. However, he also acknowledged that Marvis Jr. stayed part of the time with his half-sister because his grandmother was in and out of the hospital. He testified that if he obtained custody on those weeks when he worked graveyard shift, and given his mother's poor health, Marvis Jr. could stay with Ms. Miller's mother in Leesville.

In compliance with the trial court's instructions noted in the November 3, 2014 trial court minutes, Marvis Jr. was interviewed twice before the hearing on the rule by Mark Iflind[10], a licensed professional counselor. Based on an in-chambers stipulation, the parties agreed that a summary of Mr. Iflind's testimony could be introduced into evidence rather than calling him as a witness. Thereafter, the trial court summarized Mr. Iflind's testimony as follows:

> That the child, both after being interviewed by being brought in by the mother and by the father was very consistent and emphatic that he did not want to move to Hammond, that he wanted to remain living in DeRidder because of his family and friends and activities. Mr. Iflind did not identify any particular stressors that the child is going through currently living in Hammond such that he would be clinically depressed or suffering in any way from his relocation to Hammond. But as far as the child's preference and views about the proposed relocation, it was clearly the child's desire not to relocate and to remain here.
>
> The other thing that Mr. Iflind stated was that the mother expressed concerns about the child's educational needs being met here

---

[10] Dr. Iflind is referred to as "Dr. Mark Einfeld" in Ms. Miller's appellate brief.

in DeRidder and what she was doing to address those issues in Hammond with tutoring and his schoolwork. And Mr. Iflind also stated that he discussed with Mr. Melvin whether or not he had a plan to address educational needs of the child; and his proposal or plan for that was that he had educators and teachers and, I think, an assistant principal that were members of his family and that he was willing to have the same type of tutoring and address the educational needs of the child here.

With regard to the educational issue set forth in the last paragraph of the stipulated testimony, the trial court stated: "Now, I'm not saying one is better than the other; I'm just stating that's what each parent had told Mr. Iflind and that's what Mr. Iflind would testify to if he were called here as a witness today." Neither party objected to the stipulation.

The trial court then cleared the courtroom and called Marvis Jr. to testify. Upon completion of the child's testimony, the trial court ordered that the testimony be sealed. The record before us contains nothing with regard to the child's testimony, sealed or otherwise. Still, neither party objected to the trial court allowing the testimony outside the presence of the parents.

With regard to the remainder of the testimonial record, both Ms. Miller and Mr. Melvin attempted to cast the other in a less than favorable light. Mr. Melvin questioned her concerning her relationship with her current husband, both during her marriage to Mr. Melvin and after the divorce, but prior to her May 5, 2014 marriage. Ms. Miller acknowledged that her current husband did spend the night in her home on some occasions after her divorce from Mr. Melvin, but described him as a church friend whom she had known for ten years. She denied that he slept in her bed on those visits. She responded by accusing Mr. Melvin of having his first wife stay with him on occasion after his divorce from Ms. Miller; and reminded him that he had traveled to Houston, Texas, with Marvis Jr. and met a

female "friend" whom she claims spent the night with him in a hotel. Ms. Miller's source for this information was Marvis Jr.

Ms. Miller testified that Mr. Melvin physically and verbally abused her during their marriage, and this action on his part resulted in her obtaining a restraining order against him. She also testified that on a number of the weekends when she worked at the Coushatta Resort, Mr. Melvin would show up at the casino and drop Marvis Jr. off at the Casino's child care center.[11] Ms. Miller further noted that Mr. Melvin failed to pay his $463.00 per month child support obligation after the divorce, and he only began paying in 2013, after she retained a lawyer to collect the arrearages. She testified that he still owed $3,000.00 on his support obligation.[12]

According to Ms. Miller, the status of Mr. Melvin's overall financial picture is no different from his child support obligation, in that he is delinquent on both counts. She testified that she worked two jobs and went to school at the same time in order to make ends meet during the marriage. Ms. Miller testified that, despite their divorce, she still receives collection calls for financial obligations Mr. Melvin has defaulted on.

When Mr. Melvin attempted to assert the position of former judges involved in the prior aspects of the litigation, the trial court interrupted and explained that the only issue it intended to consider was the failure of Ms. Miller to provide Mr. Melvin with notice of the anticipated move to Baton Rouge and Hammond. The trial court then explained that if Ms. Miller were to return to Beauregard Parish with Marvis Jr. immediately, the custody issue would become moot for lack of a

---

[11] Mr. Melvin acknowledged his frequent trips to the casino and that if he had Marvis Jr. in his custody at the time, he would place the child in the casino's child care facility.

[12] Mr. Melvin acknowledged that he owed his former wife past due child support and that his salary had been garnished for the collection of that amount.

change of circumstances, and Mr. Melvin's petition would be dismissed. The trial court explained that, in its opinion:

> This is a relocation trial over the factors found in 9:355.14 as to whether Ms. Miller has met the burden of proof that I'm going to allow the principle residence of the child to be relocated to Hammond, Louisiana, or not. This is not about who's the better parent, strictly speaking.

After the completion of the evidentiary phase of the litigation, the trial court rendered a judgment consistent with the above statement. The trial court did not change domiciliary custody. Instead, it simply ordered that Marvis Jr. be returned to Beauregard Parish and the prior custody judgment would be unaffected if Ms. Miller chose to return with her child.

When properly raised, relocation issues within child custody situations are addressed in La.R.S. 9:355.1 to 9:355.19. The term "relocation" as it applies to this matter is defined in La.R.S. 9:355.1(2) as "a change in the principal residence of a child for a period of sixty days or more, but does not include a temporary absence from the principal residence." With regard to the application of the notice requirements of the relocation statutes to factual situations similar to that which is before us, we note that La.R.S. 9:355.2(B)(3) provides that the requirements apply to a proposed relocation where:

> There is a court order awarding custody and there is an intent to establish the principal residence of a child at any location within the state that is at a distance of more than seventy-five miles from the principal residence of the child at the time that the most recent custody decree was rendered.[13]

Louisiana Revised Statutes 9:355.4(A) provides that "[a] person proposing relocation of a child's principal residence shall notify any person recognized as a parent and any other person awarded custody or visitation under a court decree as

---

[13] While no evidence was introduced to establish the distance between DeRidder and Baton Rouge or DeRidder and Hammond, it is not disputed that in both cases, the distance is more than seventy-five miles.

13

required by R.S. 9:355.5."[14] The party entitled to receive notice has thirty days in which to object in writing to the proposed relocation. La.R.S. 9:355.7. If the party entitled to notice fails to object, the party seeking to relocate the child's principal residence may move forward in doing so. La.R.S. 9:355.9. On the other hand, if a written objection is perfected, "the person proposing relocation of the principal residence of the child shall initiate within thirty days after receiving the objection a summary proceeding to obtain court approval to relocate." *Id*. At the hearing on the relocation issue, "[t]he person proposing relocation has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child." La.R.S. 9:355.10.

After initiation of the summary proceeding in a contested relocation situation, any temporary move by the requesting party is governed by La.R.S. 9:355.12, which reads as follows:

A. The court may grant a temporary order allowing relocation.

B. The court, upon the request of the moving party, may hold an expedited preliminary hearing on the proposed relocation but shall not grant authorization to relocate the child on an ex parte basis.

C. If the court issues a temporary order authorizing relocation, the court shall not give undue weight to the temporary relocation as a factor in reaching its final determination.

D. If temporary relocation of a child is permitted, the court may require the person relocating the child to provide reasonable security guaranteeing that the court-ordered physical custody or visitation with the child will not be interrupted or interfered with or that the relocating person will return the child if court authorization for the relocation is denied at trial.

E. An order not in compliance with the provisions of this Section is not enforceable and is null and void.

_____

[14] Louisiana Revised Statutes 9:355.5 sets out the manner of service of the proposed relocation notice as well as the specific information required to be a part of the notice.

With regard to the ultimate resolution of the relocation issue, La.R.S. 9:355.13 (emphasis added) provides that "[a] trial on the proposed relocation *shall be assigned* within sixty days after the filing of the motion to obtain court approval to relocate."

With regard to the effect of the statutory notice on the burden of proof in a change of custody matter, if a custodial parent provides the required statutory notice, his or her attempt to relocate would "not constitute a change of circumstances warranting a change of custody." La.R.S. 9:355.17. On the other hand, "[r]elocating without prior notice if there is a court order awarding custody or relocating in violation of a court order *may* constitute a change of circumstances warranting a modification of custody." *Id.* (Emphasis added.)

In a case where the moving party fails to give the proper statutory notice and the other party raises that failure as an issue in the ensuing litigation, the trial court has three options:

> The court may consider a failure to provide notice of a proposed relocation of a child as:
>
> (1) A factor in making its determination regarding the relocation of a child.
>
> (2) A basis for ordering the return of the child if the relocation has taken place without notice or court authorization.
>
> (3) Sufficient cause to order the person proposing relocation to pay reasonable expenses incurred by the person objecting to the relocation.

La.R.S. 9:355.6.

Clearly Ms. Miller did not comply with the statutory framework for obtaining permission to relocate the child to a new residence over seventy-five miles from DeRidder. However, the record is also clear that Mr. Melvin did not object to her failure to give him notice of the relocation. Instead, he sought a

15

change of the custodial parent arrangement based on the relocation as a change of circumstances and the child's preference as proof of the best interest requirement. The trial court did not address that issue at the hearing on the rule, and we find that formulating a judgment pursuant to La.R.S. 9:355.1 to 9:355.19 as a relocation-notice issue was legal error.

> [W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.

*Evans v. Lungrin*, 97-541, 97-577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735, (citations omitted).

We will consider the custody issue *de novo*.

In performing a *de novo* review, we first note that the litigants agree that the June 18, 2012 joint custody judgment was not a "considered decree" subject to the "heavy burden" requirement of *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986). A decree only becomes a considered decree when the trial court receives and considers evidence relating to "parental fitness to exercise care, custody, and control" of a child. *Major v. Major*, 02-2131, p.7 (La.App. 1 Cir. 2/14/03), 849 So.2d 547, 551. That being the case, Mr. Melvin's burden of proof was to show that a material change of circumstances occurred since the June 18, 2012 judgment, and that his proposed modification of that judgment was in Marvis Jr.'s best interest. *Hensgens v. Hensgens*, 94-1200 (La.App. 3 Cir. 3/15/95), 653 So.2d 48, *writ denied*, 95-1488 (La. 9/22/95), 660 So.2d 478.

Even though notice of relocation is not the issue before us, relocation is. To that end, La.R.S. 9:355.17 (emphasis added) provides that "[r]elocating without prior notice . . . *may* constitute a change of circumstances warranting a

16

modification of custody." However, as stated in *Hensgens*, "an intrastate move is not *per se* a material change of circumstances such that we may presume that it will materially affect the children's welfare without further evidence." 653 So.2d at 53; *See also Silbernagel v. Silbernagel*, 06-879 (La.App. 5 Cir. 4/11/07), 958 So.2d 13.

In this case, the only evidence of an effect on Marvis Jr.'s welfare was Mr. Melvin's assertion that the child cried and did not wish to return to his mother after the 2014 summer vacation period. In considering this assertion, we note that this nine-year-old child had yet to spend over one week outside of Beauregard Parish when the crying incident occurred, and Mr. Melvin filed his suit nine days after Marvis Jr. began school in Hammond. In rendering the judgment forcing Ms. Miller to move back to Beauregard Parish or forfeit custody of her son, the trial court relied almost exclusively on Marvis Jr.'s desire to live in Beauregard Parish.

The jurisprudence supports a finding that a minor child's preference is not sufficient evidence for a parent seeking a change of custody to overcome the burden of establishing that the relocation was a change of circumstances sufficient to materially affect the child's welfare. In *Richardson v. Richardson*, 01-777, p. 15 (La.App. 1 Cir. 9/28/01), 802 So.2d 726, 735, *writ denied*, 01-2884 (La. 11/16/01), 802 So.2d 618, the first circuit held that the twelve-year-old child's preference "is only one of eight factors to consider and a child's preference is never the sole determining factor in a custody decision." In *Stroud v. Stroud*, 43,003, p. 10 (La.App. 2 Cir. 12/14/07), 973 So.2d 865, 871, the second circuit stated the following with regard to this issue:

> Although Ryan has expressed the preference to live with his father, the record does not show him to be of an age or level of maturity at which his choice should be controlling, particularly considering there was no evidence that his mother provided an inadequate environment for him. At the time of trial, Ryan was still

17

12, but soon to turn 13. His main reasons for wanting to continue living with his father were friends, the school and church he attended, and sports. These are not the considered reasons of mature teenager who wishes to spend time with his father before leaving home for college. While friends, church, and extracurricular activities are important to a child, they are not legally sufficient to justify a change in custody in this case where other significant concerns exist and where the custodial parent has provided a suitable home for the child.

As previously stated, the trial court in the matter now before us made it plain at one point in Mr. Melvin's testimony that Ms. Miller's failure to properly notify Mr. Melvin of the proposed relocation, and not her fitness as a parent, was the only issue to be decided.

Additionally, our *de novo* review of the record causes us to disagree with the trial court's conclusion that Ms. Miller was not in good faith when she first moved to Baton Rouge. She had lost her job two months before, and the record before us includes no evidence to reject her testimony that employment opportunities were more available in Baton Rouge than in Beauregard Parish. She married in May of 2014, and this new relationship required adjustments to her life. Nothing in the record suggests that she moved with any ill will toward Mr. Melvin or with any intention to cause him to lose contact with his son. In fact, she offered to voluntarily expand Mr. Melvin's visitation privileges to maintain his relationship with his son. While her marriage certainly played a part in her motivation to relocate, other factors, including employment opportunities and Marvis Jr.'s educational opportunities, also clearly played a part.[15] We also note that seeking a new job has been found to be a good faith reason for relocation. *See Johnson v. Johnson*, 99-1933 (La.App. 3 Cir. 4/19/00), 759 So.2d 257, *writ denied*, 00-1425

---

[15] While Mr. Melvin questioned the quality of the new school Marvis Jr. attended, the only evidence on this point is the Sylvan findings that when Marvis Jr. was first tested, he was performing on a second grade level, and this increased to almost a fourth grade level after his exposure to the Hammond school system and the assistance provided by Sylvan.

18

(La. 5/31/00), 762 So.2d 635; *Leger v. Leger*, 03-419 (La.App. 3 Cir. 7/2/03), 854 So.2d 955.

Separate from the issue of the relocation being proposed on a good faith basis is the requirement that it is in the best interest of the child. To assist the trial court in determining whether relocation is in the best interest of a child, La.R.S. 9:355.14 sets forth a number of factors to consider:

A. In reaching its decision regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:

(1) The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.

(3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's views about the proposed relocation, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.

(6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.

(7) The reasons of each person for seeking or opposing the relocation.

(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.

(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.

(10) The feasibility of a relocation by the objecting person.

(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.

(12) Any other factors affecting the best interest of the child.

B. The court may not consider whether the person seeking relocation of the child may relocate without the child if relocation is denied or whether the person opposing relocation may also relocate if relocation is allowed.

In considering all of these factors, we do not find that they favor a change of domiciliary custody.

***The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.***

While Marvis Jr. has spent his entire life in Beauregard Parish in close proximity to his paternal relatives, the move to Hammond would have a minimal effect on those relationships. Currently, with the exception of using his ailing paternal grandmother's home as an afternoon school bus stop, Marvis Jr.'s involvement with these family members is dictated by Mr. Melvin's custodial visitation schedule which will not appreciably change with the move to Hammond. Were Marvis Jr. to remain in DeRidder, the remainder of the time would be spent with his mother, his domiciliary custodian. Additionally, while Mr. Melvin testified to friendships with other students, there is no evidence of such significant

relationships, and new friendships can, and most likely will, be formed with students in Hammond.

### *The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.*

Marvis Jr. was nine years old at the time of the hearing on the rule, and the record contains no evidence of his level of development other than the fact that as a fourth grader, he was functioning well below that level from an educational standpoint. The only evidence concerning the impact on his emotional development came from Mr. Iflind, whose stipulated testimony was to the effect that he found no evidence of particular stressors affecting Marvis Jr., and no evidence of depression or suffering caused by the relocation to Hammond.

### *The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.*

Ms. Miller made it plain in her testimony that she had no intention of interfering with the father/son relationship between Mr. Melvin and Marvis Jr. Since the relocation to Hammond, there has been little, if any, disruption of the existing visitation schedule, and Ms. Miller has been primarily responsible for the transportation of Marvis Jr. to and from DeRidder. Financially, both parents have a stable income and are able to handle the expenses associated with the visitation process.

### *The child's views about the proposed relocation, taking into consideration the age and maturity of the child.*

As previously discussed, Marvis Jr.'s views concerning the relocation is a matter to be taken into consideration. However, in this case, he is only nine years old and has never experienced the world outside of Beauregard Parish. A child of such tender age should not be able to dictate his parents' life choices simply

because he does not wish to make a change in his personal situation. His view concerning the relocation should carry very little weight.

***Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.***

The record clearly reflects that no such pattern exists.

***How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.***

Ms. Miller believes that Marvis Jr.'s quality of life will be better in Hammond, while Mr. Melvin argues otherwise. At best, it can be said that Marvis Jr. would not suffer from either location. Ms. Miller believes that Marvis Jr.'s educational opportunities will be enhanced by the relocation to Hammond, and the Sylvan test results seem to support that belief. Mr. Melvin disagrees and is concerned for Marvis Jr.'s safety in Hammond based on comments made to him by a Baton Rouge acquaintance. There is a probability that Marvis Jr. would obtain an adequate education in either public school. However, neither parent expressed a plan to face future educational expenses as Marvis Jr. matures.

***The reasons of each person for seeking or opposing the relocation.***

Ms. Miller claims to have made the move for better job opportunities, to be with her husband, and for better educational opportunities for her son. Mr. Melvin's only claim to domiciliary custodial status is because Marvis Jr. has told him he is unhappy with the relocation.

***The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.***

Until Ms. Miller lost her position with the SSA, the income of both parents was basically the same. Although she has a decreased income in her Baton Rouge position with Hertz Rentals and, although there is no specific evidence of the

22

combined income of her and her new husband, it apparently balances out. Thus, there appears to be no negative economic impact created by the relocation.

***The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.***

Mr. Melvin has a history of not paying his child support payments, and at the time of the trial on the rule, his wages were being garnished to collect the past-due support payments. There was some discussion at the trial on the rule concerning his significant arrearages being offset by spousal support payments owed to him by Ms. Miller, but this was not made clear in the testimony.

***The feasibility of a relocation by the objecting person.***

At the time of the trial on the rule, Mr. Melvin had been working for the same employer for thirty years, although the nature of his employment and the name of his employer were not discussed. The only evidence to support a finding that relocation on his part is not feasible is the fact that he resides with, and cares for, his elderly mother.

***Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.***

Ms. Miller testified to a history of abuse at the hands of Mr. Melvin, but she did not elaborate on the particulars and stated only that it led to her obtaining a protective order against Mr. Melvin after they separated in November of 2010. Thus, the abuse giving rise to the protective order predated the June 18, 2012 consent decree, and there is no evidence of substance abuse, harassment, or violence by either party since that time.

***Any other factors affecting the best interest of the child.***

The evidentiary record contains no additional factors to be considered.

## *SUMMARY*

The relationships at issue in this litigation reflect many of the difficulties associated today with raising children who are the product of broken homes. We have two adults whose personal relationship has been dissolved by divorce, and each must move forward in their lives. Complicating those forward moving efforts is the fact that they are the parents of a young child whom they both obviously love, but who both have different views of what is in the child's best interest. Complicating these relationships even further is the fact that the child's view differs from the domiciliary parent, and if the truth were known, probably differs from the non-domiciliary parent. The question is, to what extent can we allow the child's ideas to interfere with the attempts by the parents to move forward with their lives?

In this case, the answer is rather straight forward. Ms. Miller decided to remarry and begin a new life with her husband and children. Personal and economic matters established in her mind the understanding that a move to Baton Rouge, and ultimately to Hammond, was not only in her best interest, but also in the best interest of her children. Marvis Jr. rejected the relocation from DeRidder without even attempting to experience what the relocation opportunity had to offer. Instead, according to his mother, it was more important for him to remain in DeRidder to play ball.

In this day of such a mobile society, the decision of a nine-year-old child cannot be of sufficient weight to overrule the obligations and decisions of a domiciliary custodial parent to do what he or she believes is in their own best interest as well as that of the child, absent other evidence to the contrary. We find that Mr. Melvin failed to carry his burden at this stage of the proceeding to establish that a material change of circumstances occurred and that naming him

temporary domiciliary custodian, pending a trial on the merits, is in Marvis Jr.'s best interest.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's judgment ordering the return of Marvis Melvin, Jr. to Beauregard Parish under the terms and conditions set forth in the judgment of March 13, 2015; render judgment rejecting the request of Marvis Melvin to be named temporary custodial parent pending a trial on the merits of his petition; render judgment reinstating the custodial terms of the June 18, 2012 consent judgment; and remand this matter to the trial court for further proceedings.  We assess all costs of this appeal to Marvis Melvin.

**REVERSED, RENDRED, AND REMANDED.**

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

MARVIN MELVIN

VERSUS

KIMBERLY MILLER

AMY, J., dissenting.

I respectfully dissent from the majority opinion. As the majority recognizes, the pleadings in this case did not offer the trial court distinct, adverse filings regarding change of custody and request for relocation. In my view, however, both issues were before the trial court.

For example, the interplay of the parties' adverse requests may be seen in the petition to modify custody. This pleading by Mr. Melvin references Ms. Miller's request for relocation and appends Ms. Miller's relocation notice as well as Mr. Melvin's related objection. Furthermore, the parties were aware of the matters under consideration by the trial court on the date of the hearing. The trial court clearly expressed at that time which issues were under consideration. It did so without Ms. Miller's objection. Instead, both parties presented evidence and related testimony supporting their respective positions of relocation and change of custody.

Louisiana Code of Civil Procedure Article 1154 addresses amendment of the pleadings and instructs that:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall

do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

*See also* La.Code Civ.P. art. 865 (providing that "[e]very pleading shall be so construed as to do substantial justice.").

Referencing Article 1154, the second circuit has recently explained that:

When the pleading in question is construed in its entirety and with all other matters occurring during trial which relate to the pleading, and it is more reasonable than not to conclude that the adverse party received fair notice and was fairly informed of the pleading's intended substantive result and procedure by which that result was intended to be accomplished, the pleading will be held to be legally effective and to satisfy the requirements of the Code of Civil Procedure which are raised in objection to the pleading.

*Zimmerman v. Progressive Sec. Ins. Co.*, 49,982, pp. 6-7 (La.App. 2 Cir. 8/12/15), 174 So.3d 1230, 1236. Again, Mr. Melvin's pleading annexed the pre-existing request for relocation and, without objection, the parties addressed the issues before the court at the hearing by presenting evidence and testimony. *See Galland v. Galland*, 12-1075 (La.App. 3 Cir. 3/20/13), 117 So.3d 105 (wherein a panel of this court concluded that the trial court erred in unilaterally expanding the pleadings *over objection* of the mother and awarding primary custody to the father when the parties had not placed that issue before it).

In addition to the absence of objection below, Ms. Miller does not now object to the trial court's consideration of both issues. Accordingly, I find that the scope of review must be confined to the sole and narrow issue raised by Ms. Miller, *i.e.*, "[w]hether or not the trial court committed manifest error in not allowing Appellant to relocate with the child to Hammond, Louisiana." As the majority opinion instead resolves this matter upon a finding of legal error and resulting de novo review, I respectfully dissent.

2